**Joseph Robert KELSO, Plaintiff,**

v.

**U.S. DEPARTMENT OF STATE, Defendant.**

**No. CIV.A. 98–00874 (CKK).**

United States District Court, District of Columbia.

July 31, 1998.

Nancy A. Luque, Kathleen H. McGuan, Reed, Smith, Shaw & McClay, Washington, DC, for Plaintiff.

Stacy M. Ludwig, Marina Utgoff Braswell, United States Attorney's Office, Washington, DC, for Defendant.

## MEMORANDUM OPINION

KOLLAR–KOTELLY, District Judge.

On June 3, 1998 Plaintiff Joseph Robert Kelso filed a Supplemental Memorandum in Support of Motion To Show Cause for Con-

tempt, in which he argues that 22 C.F.R. § 51.81 and principles of res judicata prohibit the Department of State from re-revoking his passport. This issue has been fully briefed with an opposition memorandum from the Defendant and a subsequent Reply from Mr. Kelso. Having considered the arguments advanced by counsel, the factual record presented, and the governing law, the Court denies the Plaintiff's motion.

## I. BACKGROUND

Many of the facts of this case have already been summarized in the Court's April 29, 1998 Memorandum Opinion, which the Court hereby incorporates. *See Kelso v. United States Dep't of State*, 13 F.Supp.2d 1, 1–4 (D.D.C.1998). That decision granted the Plaintiff's request for a preliminary injunction to compel the Secretary of State to vacate her previous decision to revoke Mr. Kelso's passport based on an analysis of 22 C.F.R. § 51.81.[1] Although the Court regrettably had to issue a subsequent Order to compel the Defendant to comply with its mandate, on May 28, 1998, the Defendant vacated its earlier revocation and accordingly issued a replacement passport.

On June 1, 1998, however, the Department of State requested the United States Embassy in London to revoke Mr. Kelso's replacement passport. *See* Pl.'s Supp. Mem. in Support of Mot. To Show Cause for Contempt at Ex. A (letter from Marina Utgoff Braswell to Nancy Luque, June 2, 1998, at 2). The Department of State justified its revocation under 22 C.F.R. §§ 51.70, 51.72, reasoning that because Mr. Kelso remained the alleged subject of a federal arrest warrant who is deemed to present a flight risk, the agency was authorized by regulation to revoke his replacement passport. It is this revocation decision that has brought the parties back before the Court.

## II. NEITHER THE DEPARTMENT OF STATE'S OWN REGULATIONS NOR PRINCIPLES OF RES JUDICATA PROHIBIT THE AGENCY FROM REVOKING MR. KELSO'S REPLACEMENT PASSPORT.

### A. *The "mandatory" nature of § 51.81 does not inhibit the Department of State's authority to revoke a replacement passport.*

■ Pressing into action this Court's previous finding that 22 C.F.R. § 51.81 imposes a mandatory deadline on the Department of State, Plaintiff posits that the mandatory nature of § 51.81 bars the Defendant from revoking a replacement passport. That § 51.81 is "mandatory," however, does not foreclose the Department of State from acting as it has. To be sure, § 51.81 mandates that the Department of State initiate a post-revocation hearing within sixty days from request. *See* 22 C.F.R. § 51.81; *Kelso*, 13 F.Supp.2d at 8–11 (D.D.C.). Moreover, this deadline is mandatory because the regulation prescribes a specific consequence for the agency's failure to comply, namely, vacation of the revocation. *See* 22 C.F.R. § 51.81 ("[T]he adverse action shall be automatically vacated unless such proceeding is initiated by the Department ... within 60 days after request ...."); *Kelso*, 13 F.Supp.2d at 7–8 ("Section 51.81 satisfies the Supreme Court's test for determining whether a regulation is mandatory."); *see also United States v. James Daniel Good Real Property*, 510 U.S. 43, 63, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993) ("[I]f a statute does not specify a consequence for noncompliance with statutory timing provisions, the federal courts will not in the ordinary course impose their own coercive sanction.").

■ The word "mandatory," though it sounds redoubtable and impressive, is no

---

1. Section 51.81 of Title 22 of the Code of Federal Regulations provides, in pertinent part:
   A person who has been the subject of an adverse action with respect to his or her right to receive or use a passport shall be entitled, upon request ... to require the Department or the appropriate Foreign Service post, as the case may be, to establish the basis for its action in a proceeding before a hearing officer.... [T]he adverse action shall be automatically vacated unless such proceeding is initiated by the Department ... within 60 days after request, or such longer period as is requested by the person adversely affected and agreed to by the hearing officer.
   22 C.F.R. § 51.81 (1997).

more than a term of art with a precise legal meaning; one that bears no resemblance to that advocated by the Plaintiff. It exists as one half of a dichotomy that the courts have constructed to evaluate whether and to what extent to sanction agencies that fail to comply with a statutory (or regulatory) deadline. Where there is no "clear indication that Congress intended otherwise, we will deem a statutory deadline to be *directory*." *Brotherhood of Railway Carmen Div. v. Peña*, 64 F.3d 702, 704 (D.C.Cir.1995) (emphasis added). On the other hand, where Congress or an agency has clearly evinced its intent to fashion a binding deadline, courts are more inclined to deem it *mandatory*. *See James Daniel Good Real Property*, 510 U.S. at 63, 114 S.Ct. 492; *Gottlieb v. Peña*, 41 F.3d 730, 734 (D.C.Cir.1994).

What elevates a timing provision from the status of directory to that of mandatory is that the regulation or statute "specif[ies] a consequence for noncompliance with" the timing provision. *James Daniel Good Real Property*, 510 U.S. at 63, 114 S.Ct. 492. Where there is no specific consequence, the Supreme Court has noted that "federal courts will not in the ordinary course impose their own coercive sanction." *Id.* From these principles emerges a corollary: that a federal court, when faced with a mandatory deadline that prescribes a specific consequence, will not impose a different or more coercive sanction than the statute or regulation itself sets forth. It would, indeed, be an odd rule that when Congress or federal agencies fashion a precise consequence for noncompliance with a timing provision that they also intend the courts to engraft additional penalties never codified or promulgated.

With this understanding, the inquiry naturally becomes: whether the precise sanction for noncompliance set forth in 22 C.F.R. § 51.81 prohibits the Department of State from revoking a replacement passport. A plain reading of the regulation demonstrates that it clearly does not. The only consequence specified in § 51.81 for the Department of State's failure to initiate a hearing within sixty days is an automatic vacation of the prior revocation. *See* 22 C.F.R. § 51.81. Black's Law Dictionary defines "vacate" as:

"To annul; to set aside; to cancel or rescind. To render an act void; as, to vacate an entry of record, or a judgment." BLACK'S LAW DICTIONARY 1388 (Spec. Deluxe 5th ed.1979). Certainly, to vacate a revocation decision is to annul it. Yet to concede that proposition is not to say that vacatur prevents the Department of State from issuing a different revocation order. Although Plaintiff protests that "[t]he regulatory deadline would hardly be mandatory if the Department could simply revoke the same passport or its replacement again," Pls.' Supp. Mem. at 3, this complaint misconceives the nature of mandatory deadlines. As explained previously, the contours of a mandatory deadline are established by the scope of the specific sanction that the statute or regulation prescribes. Here, § 51.81 mandates that the Department of State's failure to initiate a hearing within sixty days results in the automatic vacation of its revocation. It speaks not at all to whether the Department is forever barred from revoking a replacement passport based on the same factors that animated the initial decision. To hold otherwise would require this Court "to impose [its] own coercive sanction," *James Daniel Good Real Property*, 510 U.S. at 63, 114 S.Ct. 492, an invitation this Court declines.

This also underscores why the one case that the Plaintiff cited is inapposite. In *Ramon–Sepulveda v. INS*, 824 F.2d 749 (9th Cir.1987), the court precluded the INS from reopening an administrative hearing to admit an individual's birth certificate after the agency had failed to carry its burden during the initial hearing. The regulation before the Ninth Circuit, however, as the Plaintiff himself notes, "expressly provided that the Immigration Judge could reopen a hearing after a decision only if there were new evidence that the INS could not have discovered or presented at the hearing." Pl.'s Reply at 6. It is, therefore, no surprise to learn that the Ninth Circuit precluded the INS from reopening the hearing once it determined that the agency could have obtained the birth certificate from Mexico. Unlike the sanction that Mr. Kelso seeks to impose upon the Department of State for its dilatory response to his request for a hearing, the consequence for the INS's oversight in *Ramon–Sepulve-*

*da*—barring the agency from reopening the hearing—was specified by regulation as the consequence for failure. Nothing in § 51.81 expressly precludes the Department of State from issuing a subsequent revocation order after an initial one has been vacated.

▮ Lastly, Plaintiff's theory "fail[s] to adhere to the general rule that '[w]hen ... there are less drastic remedies available for failure to meet a statutory deadline, courts should not assume that Congress intended the agency to lose its power to act.'" *Gottlieb v. Peña*, 41 F.3d 730, 736 (1994) (quoting *Brock v. Pierce County*, 476 U.S. 253, 260, 106 S.Ct. 1834, 90 L.Ed.2d 248 (1986)). Here, the consequence that the agency itself specified for noncompliance in § 51.81 is less drastic than that advocated by Mr. Kelso. By mandating automatic vacation of a revocation hearing, § 51.81 establishes a sanction for failing to initiate promptly the hearing while it concomitantly avoids stripping the Department of State of the power to revoke the passport of one who is subject to a federal arrest warrant and who is feared by federal law-enforcement officials to present a substantial flight risk. Plaintiff's proposal for such a drastic consequence is simply advocacy; were this Court to adopt his argument it would be reversible error. *See Gottlieb*, 41 F.3d at 736.

B. *The Department of State's vacated revocation, by definition, lacks any preclusive consequences that would bar the agency under principles of res judicata.*

▮ Plaintiff also claims that principles of res judicata bar the Department of State from revoking his replacement passport. According to the salutary common-law doctrine of res judicata, "a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *see also Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 326, 75 S.Ct. 865, 99 L.Ed. 1122 (1955); *Cromwell v. County of Sac*, 94 U.S. 351, 352, 24 L.Ed. 195 (1876); *Bank of the United States v. Donnally*, 33 U.S. 361, 370, 8 Pet. 361, 8 L.Ed. 974 (1834). Where an administrative agency "act[s] in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesitated to apply *res judicata* to enforce repose." *United States v. Utah Constr. & Mining Co.*, 384 U.S. 394, 422, 86 S.Ct. 1545, 16 L.Ed.2d 642 (1966); *see also Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991) ("We have long favored application of the common-law doctrine[ ] of ... res judicata (as to claims) to those determinations of administrative bodies that have attained finality."). Although it is beyond peradventure that relitigation of Mr. Kelso's passport revocation encompasses the same parties and the same claims, it is not at all clear that the vacatur constituted a final judgment on the merits.

▮ Plaintiff never attempts to argue that somehow the automatic vacation mandated by § 51.81 was in fact a final *judgment* or *ruling* on the merits. Rather, reasoning by analogy to the Federal Rules of Civil Procedure, he maintains that the vacatur operated as a dismissal for failure to prosecute under FED. R. CIV. P. 41(b).[2] Without a doubt, a dismissal for failure to prosecute, though the Court never addresses the substantive merit of the plaintiff's case, "operates as an adjudication upon the merits." FED. R. CIV. P.

---

2. In his Reply brief, the Plaintiff argues for the first time that the Department of State's failure to initiate the hearing within sixty days also resembles a dismissal based on the statute of limitations. *See* Pl.'s Reply at 7–10. Except for the fact that dismissals based on the statute of limitations and those ordered for failure to prosecute both loosely involve temporal concerns, they share little else, and are analytically quite distinct. A vigorously prosecuted case may nonetheless be time barred by statute; while an otherwise timely filed claim may languish on a court's docket through plaintiff's indolence. Typically, the Court refuses to consider distinct arguments raised for the first time in a reply brief. *See, e.g., Herbert v. National Academy of Sciences*, 974 F.2d 192, 196 (D.C.Cir.1992). Yet because Mr. Kelso fares no better under his statute-of-limitations argument, the Department will suffer no prejudice if the Court considers it.

41(b). Indeed, a dismissal based on the statute of limitations also acts as a judgment on the merits. *See id.* It is Rule 41(b) itself, however, that dictates this result. In relevant part, that Rule provides:

> Unless the court in its order for dismissal otherwise specifies, a dismissal under the subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join a party under Rule 19, operates as an adjudication upon the merits.

*Id.* Unlike dismissals for failure to prosecute or based on the statute of limitations, there is no specific rule—in either the Federal Rules or the Code of Federal Regulations—that specifies the preclusive effect of an "automatically vacated" order from the Department of State.

▪ In fact, basic understandings of vacatur dramatize that, by definition, that which is vacated loses the ability to "spawn[ ] any legal consequences." *United States v. Munsingwear, Inc.,* 340 U.S. 36, 41, 71 S.Ct. 104, 95 L.Ed. 36 (1950). "As a general matter a judgment which is vacated, for whatever reason, is deprived of its conclusive effect, both as collateral estoppel and res judicata." *Wolcott v. Ginsburg,* 697 F.Supp. 540, 543 (D.D.C.1988). In a variety of contexts, this Circuit has recognized consistently that to vacate is to deprive of preclusive effect. *See, e.g., Aviation Enters., Inc. v. Orr,* 716 F.2d 1403, 1408 (D.C.Cir.1983) ("We vacate the order of the District Court setting aside the contract to Huff Leasing, *thus draining the court's underlying findings of fact of whatever vitality they might otherwise have had for res judicata purposes.*"); *Nader v. Volpe,* 466 F.2d 261, 272 (D.C.Cir.1972) ("We realized, too, that appellants might wish to pursue their litigative objectives in the Sixth Circuit, and *to free them from potential embarrassment by any claim of res judicata or collateral estoppel, we also vacated the District Court's order of dismissal.*") (citation omitted) (emphasis in all quotations added). In-

deed, the Supreme Court has twice reaffirmed that vacatur can be an equitable remedy to relieve a party of a judgment's preclusive effect, review of which cannot be had on appeal due to intervening events that moot the controversy. *See United States Bancorp Mortgage Co. v. Bonner Mall Partnership,* 513 U.S. 18, 115 S.Ct. 386, 390–92, 130 L.Ed.2d 233 (1994); *United States v. Munsingwear,* 340 U.S. 36, 39–41, 71 S.Ct. 104, 95 L.Ed. 36 (1950). "The established practice of the Court in dealing with a civil case from a court in the federal system which has become moot while on its way here or pending our decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss." *Munsingwear,* 340 U.S. at 39, 71 S.Ct. 104. The Supreme Court has endorsed vacatur in such circumstances because "[t]hat procedure clears the path for future relitigation of the issues between the parties and eliminates a judgment, review of which was prevented through happenstance." *Id.* at 40, 71 S.Ct. 104. Moreover, courts have not hesitated to import the principles of vacatur into the administrative-law arena. *See, e.g., Lombardo v. Schweiker,* 749 F.2d 565, 567 (9th Cir.1984) ("The Appeals Council vacated the decision and remanded the case to another ALJ. Lombardo therefore, may not now claim that the decision of the first ALJ has res judicata effect.").

▪ Whether through innocent oversight or deliberate manipulation, in his Reply, Plaintiff recasts § 51.81's automatic *vacation* penalty as an automatic *reversal* sanction. *See* Pl.'s Reply at 5 ("If the Department fails to meet the regulatory deadline, the revocation decision is automatically reversed."); *id.* ("The only way the automatic reversal of the revocation decision can have any meaning is if the Secretary is precluded from re-revoking the same passport (or its replacement) on the same grounds."). Plaintiff goes so far as to state that, in fact, "pursuant to Section 51.81 and this Court's Order, the revocation decision *has been reversed.*" *Id.* at 9.[3] Whatever the cause for this mischaracterization, it

---

**3.** To the contrary, the text of the Memorandum Opinion could not be any plainer: "[T]he Department of State shall be ordered to *vacate* its January 27, 1998 decision to revoke Mr. Kelso's pass-

port." *Kelso v. United States Department of State,* 13 F.Supp.2d 1, 11 (D.D.C.1998) (emphasis added); *see also id.* at 12 (employing the word "vacate" in Order).

is clear that 22 C.F.R. § 51.81 specifies that the only sanction for noncompliance is automatic vacation of the adverse decision. This is a distinction that reflects a keen difference. In another context, this Circuit was called upon to assess the significance of a congressional amendment that implicitly contradicted Commerce Department regulations authorizing the Secretary, *inter alia*, to reverse a presiding official's determinations. *See Dart v. United States*, 848 F.2d 217, 229 (D.C.Cir.1988). The amendment authorized the Secretary to modify or vacate a presiding official's proceedings but was silent with respect to the Secretary's former power to reverse. This Circuit concluded:

> This history makes clear that the distinction between "reverse," on the one hand, and "modify" or "vacate," on the other, represents far more than a quibble about semantics. From a practical standpoint, it means the difference between a civil sanction that is based on a full hearing and one that is not.... These are not trivial distinctions. Indeed, courts assume the importance of such distinctions every day.

*Id.* at 229–30. Black's Law Dictionary further underscores the distinction between vacatur and reversal that the D.C. Circuit explored in *Dart.* Although the word reverse shares vacate's meanings of to annul and to set aside, *compare* BLACK'S LAW DICTIONARY 1185 (Spec. Deluxe 5th ed.1979) (defining "reverse"), *with id.* at 1388 (defining "vacate"), it has an additional, more extensive definition: "To reverse a judgment means to overthrow it by contrary decision, make it void, undo or annul it *for error.*" *Id.* at 1186 (emphasis added).

When this Court ordered the Department of State to vacate its decision to revoke Mr. Kelso's passport, it did not set aside or annul the Department's revocation based on error. Thus, while the vacation clearly deprived the Department's initial revocation order of any validity, it also "drain[ed] [the revocation] of whatever vitality [it] might otherwise have had for res judicata purposes." *Aviation Enters., Inc. v. Orr,* 716 F.2d 1403, 1408 (D.C.Cir.1983). Well-established principles of vacatur counsel against the Plaintiff's at-tempt to bar the Department of State from revoking his passport.

Lastly, Plaintiff summons forth a parade of horribles that he fears the Department's second revocation effort will precipitate. Specifically, Mr. Kelso fears that the Department will be able to perpetuate a vicious cycle in which it flaunts the 60–day deadline, reissues a passport, revokes that passport, remains idle for an additional 60 days, and so the process continues. From this, Mr. Kelso concludes that "[t]o permit the Department to grant itself unlimited extensions of the 60–day deadline by re-revocation, would 'emasculate' the due process protections the regulation is supposed to confer." Pl.'s Supp. Mem. at 4.

The policy concerns that animate the Plaintiff's fears are unfounded. Although the "due-process concerns that this Circuit expressed in *Bauer* [*v. Acheson* ], and to which the Secretary of State presumably responded when he promulgated corresponding regulations, turned on the opportunity to be heard during a 'procedure in which the elements of fair play are accorded,'" *Kelso,* 13 F.Supp.2d at 10 (D.D.C.) (quoting *Bauer v. Acheson,* 106 F.Supp. 445, 451 (D.D.C. 1952)), nothing in the Court's opinion today undermines those salient concerns. To be sure, were the Department perpetually able to postpone post-revocation hearings by "re-revoking" passports, the agency would violate the passport holder's Fifth Amendment rights. Yet, what stands between the Constitution's promise of due process and the Plaintiff's fearful vision is the Administrative Procedure Act, 5 U.S.C. § 706(1). Congress has empowered federal courts to "(1) compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). Where a plaintiff can demonstrate that a federal agency's failure to undertake a particular course of action threatens to vitiate fundamental due-process rights, § 706(1)'s broad authorization would permit a federal court to compel the dilatory agency to hold a prompt hearing. Section 706(1) is precisely the procedural device that Mr. Kelso may invoke if the Department of State were foolish enough

once again to default on § 51.81's 60-day deadline.

■ The Court, however, suspects that Mr. Kelso would not find § 706(1) altogether comforting because, in his view, the Department's breach of the 60-day deadline should entitle him to immediate receipt of his passport without further inquiry. To adopt Plaintiff's forfeiture-like theory, however, would permit alleged subjects of federal arrest warrants who are deemed to pose a significant flight risk to receive his or her passport simply because the Department of State's bureaucracy blundered, albeit in good faith, by failing to coordinate a hearing within sixty days. While the Fifth Amendment guarantee to due process is indifferent to whether the deprivations are the result of malice or oversight, there is no principle that dictates that the remedy for such a violation must be a court order paralyzing the agency from acting upon extant and compelling governmental interests—especially, as here, when the cause is from administrative oversight or uncontrollable circumstances and the agency has expressly indicated that it stands ready to convene a hearing as soon as possible. Less absolute remedies, such as a federal court's power to compel the Department to hold a hearing under § 706(1), adequately navigate the narrow straits between Plaintiff's due-process rights and the compelling governmental and public interest in deterring subjects of federal arrest warrants from exploiting their passports as tools of evasion. As the Supreme Court has held, "while the Constitution protects against invasions of individual rights, it is not a suicide pact." *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 160, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963). The Constitution is no more a "suicide pact" than it is a lottery through which suspected felons should reap windfalls due to nothing more than agency oversight.

Finally, the Court finds instructive, as it did in its earlier Memorandum Opinion, that portion of the Senate Report that explained the significance of § 707(b) of the Act of Oct. 7, 1978, 92 Stat. 993 (codified at 8 U.S.C. § 1185(b)). *See Kelso,* 13 F.Supp.2d at 5 (D.D.C.). As the Supreme Court has noted, 8 U.S.C. § 1185(b), which prohibits travel abroad without a passport during peacetime, "must be read in pari materia with the Passport Act [of 1926]." *Haig v. Agee,* 453 U.S. 280, 300–01, 101 S.Ct. 2766, 69 L.Ed.2d 640 (1981).[4] The Senate Committee Report clarifies that, by enacting § 1185(b), Congress did not intend to divest the Executive of its broad discretion over passport revocations in several peculiarly important contexts:

> The Committee recognizes clearly that the passport authority should not be restricted in any way which would limit the President's ability to control the departure of U.S. citizens to foreign countries *when such travel is inconsistent with a greater government interest, such as preventing a citizen who is seeking to avoid the judicial processes of the United States.*

S. REP. No. 842, 95th Cong. 14 (1978) (emphasis added). The authority by which the Secretary of State purports to revoke Mr. Kelso's passport, 22 C.F.R. § 51.70(a)(1),[5] is plainly contemplated to prevent travel by "a citizen who is seeking to avoid the judicial processes of the United States."

### III. CONCLUSION

Plaintiff rightly portrays § 51.81 as a mandatory regulatory timing provision. Beyond that he misconstrues subtle yet fundamental principles of federal procedure. Because § 51.81 is mandatory, this Court has no dis-

---

4. As explained in the Court's previous Memorandum Opinion, the Passport Act of 1926, 22 U.S.C. § 211a, provides the Secretary of State with the statutory authorization to promulgate regulations governing the issuance and revocation of passports. *See Kelso,* 13 F.Supp.2d at 4 (D.D.C.); *see also Agee,* 453 U.S. at 291, 101 S.Ct. 2766.

5. Section 51.70 provides, in pertinent part:

(a) A passport, except for direct return to the United States, shall not be issued in any case in which the Secretary of State determines or is informed by competent authority that:
(1) The applicant is the subject of an outstanding Federal warrant of arrest for a felony .... 22 C.F.R. § 51.70(a)(1). Section 51.72 authorizes the Secretary of State to revoke, restrict, or limit a passport where "[t]he national would not be entitled to issuance of a new passport under § 51.70." 22 C.F.R. § 51.72(a).

cretion to fabricate alternative, more drastic sanctions that the Department of State did not design for itself. *See Brotherhood of Railway Carmen Div. v. Peña,* 64 F.3d 702, 704 (D.C.Cir.1995). The Court, accordingly, ordered the Department to comply with § 51.81 by vacating its revocation of Mr. Kelso's passport. *See Kelso,* 13 F.Supp.2d at 12. The pellucid precedent emanating from all federal courts is that vacatur does not "spawn[ ] any legal consequences." *Munsingwear,* 340 U.S. at 41, 71 S.Ct. 104. Because vacatur "clears the path for future relitigation of the issues between the parties," *id.* at 40, 71 S.Ct. 104, by "draining [previous proceedings] of whatever vitality they might otherwise have had for res judicata purposes," *Aviation Enters., Inc. v. Orr,* 716 F.2d 1403, 1408 (D.C.Cir.1983), the Department of State is not barred by principles of res judicata from revoking Mr. Kelso's replacement passport. *See Aviation Enters., Inc.,* 716 F.2d at 1408; *Nader v. Volpe,* 466 F.2d 261, 272 (D.C.Cir.1972); *Wolcott v. Ginsburg,* 697 F.Supp. 540, 543 (D.D.C.1988); *Lombardo v. Schweiker,* 749 F.2d 565, 567 (9th Cir.1984).

## ORDER

For the reasons expressed in the Court's accompanying Memorandum Opinion, it is, this 30 day of July 1998, hereby

**ORDERED** that Plaintiff's Supplemental Memorandum in Support of Motion To Show Cause of Contempt shall be, and hereby is, **DENIED.**

**SO ORDERED.**